```
              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
                 Civil No. 16-471(DSD/LIB)
```

WEG Electric Corp,

        Plaintiff,

v.                                                     **ORDER**

Michael Pethers,

        Defendant.

     Michael P. Elkon, Esq. and Fisher & Phillips LLP, 1075 Peachtree Street, NE, Suite 3500, Atlanta, GA 30309 and Thomas W. Pahl, Esq. and Foley & Mansfield, PLLP, 250 Marqutte Ave, Suite 1200, Minneapolis, MN 55401, counsel for plaintiff.

     Kristin L. Kingsbury, Esq. and Daniels & Kibort, PLLC, 14225 Highway 55, Plymouth, MN 55447, counsel for defendant.

     This matter is before the court upon the motion for a temporary restraining order (TRO) by plaintiff WEG Electric Corporation. Based on a review of the file, record, and proceedings herein, and the arguments of counsel at the hearing, the court denied plaintiff's motion with this written order to follow.

## BACKGROUND

     This trade secret dispute arises from defendant Michael Pethers' resignation from his position as a territory account manager for WEG, an industrial electric motor manufacturer. Compl. ¶¶ 11, 26, 36. Pethers worked in that position from July 1, 2013,

to November 18, 2015.  Id. ¶ 22-26.  He did not sign a non-compete agreement or non-solicitation agreement with WEG.  Pethers Decl. ¶ 11.  On December 7, 2015, Pethers began working as a sales representative for WEG's competitor Toshiba International Corporation.  Id. ¶ 3; Supp. Compl. ¶ 38.

On January 22, 2016, an engineer from Weir Minerals e-mailed Pethers at both his WEG and Toshiba e-mail accounts, requesting a price quote on a Toshiba motor.  Id. Ex. E.  Pethers replied from his Toshiba account with a price quote, noting that it was "a few bucks less than WEG."  Id.

WEG then reviewed Pethers' WEG computer and accounts, and learned that Pethers saved WEG data – during his WEG employment – to a Dropbox account.  Supp. Compl. ¶ 44.

On January 27, 2016, WEG sent a demand letter to Pethers, requesting that he (1) return all WEG information in his possession, (2) participate in a computer forensic investigation, (3) disclose all communications with Toshiba and customers regarding WEG information, (4) refrain from soliciting business from any customer whose WEG information he disclosed while working for Toshiba, and (5) pay WEG to cover its losses.  Id. ¶ 45; id. Ex. F.  The same day, WEG also sent a demand letter to Toshiba. Pethers Decl. Ex. 4.

Pethers explained to WEG that he set up the Dropbox account "a long time back" while at WEG, that the program lacked sufficient

2

storage capacity to fit Pethers' needs, and that he stopped using the program months before leaving WEG. Pethers Decl. ¶¶ 21-22; Supp. Compl. Ex. G. Pethers authorized WEG to have sole access to and control of the account. Pethers Decl. ¶¶ 25-26. Pethers and Toshiba also reviewed his computer files and removed any WEG-related documents, and sent a copy of them to WEG. Id. ¶ 37; Supp. Compl. ¶ 50.

On February 24, 2016, WEG filed a complaint alleging violations of the Minnesota Uniform Trade Secrets Act (MUTSA) and the Computer Fraud and Abuse Act. Id. ¶¶ 72-86. WEG alleges that Pethers misappropriated WEG business documents, including contact lists, sales history lists, inventory and specifications lists, and customer-specific pricing lists. Id. ¶¶ 51, 55, 57, 59, 61, 63, 65. WEG also filed a motion for a TRO asking the court to require Pethers to:

1. return all WEG property, including property in electronic form, in his possession and forbidding him from using, disclosing, or acquiring said property (as well as any work product derived from WEG property);
2. refrain from soliciting, serving, selling to, diverting, receiving, or otherwise handling business from any of the customers reflected in the materials taken by Pethers; and
3. make available for inspection and imaging any computers, external storage devices, or personal data devices on which

> Pethers has accessed or retained WEG trade secrets or other property.

See ECF Nos. 5 and 6.  The court denied the motion from the bench. In so ruling, the court relied on the four familiar factors set forth in Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The court provides further analysis for its decision here.

**DISCUSSION**

A TRO is an extraordinary equitable remedy, and the movant bears the burden of establishing its propriety.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  The court considers four factors in determining whether a TRO should issue: (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between that harm and the harm that the relief may cause the non-moving party, (3) the likelihood of the movant's ultimate success on the merits, and (4) the public interest.  Dataphase, 640 F.2d at 114.

**I.   Likelihood of Success on the Merits**

WEG asserts that Pethers violated MUTSA by using WEG's trade secrets as a Toshiba employee.  Pethers responds that the information does not constitute a trade secret, and thus no MUTSA violation occurred.  Based on the current record, the court agrees.

A party cannot violate MUTSA if the information at issue is

not a trade secret. See Minn. Stat. § 325C.01, subd. 3 (requiring the "acquisition of a trade secret" or the "disclosure or use of a trade secret").  The moving party bears the burden of establishing that the information is a trade secret. Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999)

The types of information at issue here - customer, inventory, and pricing lists, as well as documents containing other institutional knowledge and operation strategies - generally do not constitute trade secrets.  See NewLeaf Designs, LLC v. BestBins Corp., 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001) ("The Court is unable to conclude that NewLeaf's customer lists, market intelligence, business plans, supplier information and operating information constitute trade secrets as defined by Minnesota law."); United Prods. Corp. of Am. v. Cederstrom, No. A05-1688, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006) (finding that the plaintiff's information on "customer lists, credit histories, and buying habits," "pricing information, rebate programs, mark-ups, and margins," and "long-term sales strategies" did not constitute trade secrets).  The information at issue in NewLeaf and Cederstrom parallels that put forth by WEG.

WEG's lack of specificity also weakens its claim.  WEG has not submitted any specific evidence or an example document that may contain a trade secret.  It asserts that Pethers took "sales experience information" and "strategies," but does not make clear

5

what exactly those terms entail. WEG Mem. at 16-17. A lack of specific evidence or explanation as to why certain documents are trade secrets weighs against a finding that the information constituted a trade secret. See NewLeaf, 168 F. Supp. 2d at 1043-44 ("NewLeaf provides little detail as to the specific information in each of these categories that it alleges constitute trade secrets ... [and] has failed to produce any such list or even a portion of the list to the Court.... Without anything more than NewLeaf's assertion that its customer lists should enjoy trade secret protection, the Court cannot find that NewLeaf has met its burden with respect to this information."); Cederstrom, 2006 WL 1529478, at *5. ("We are not convinced that the general categories of information articulated by UPC are sufficiently detailed to permit characterization as a trade secret."). WEG has not met its burden to establish that the allegedly misappropriated information constitutes a trade secret.

Moreover, information does not constitute a trade secret unless it "derives independent economic value." Minn. Stat. § 325C.01, subd. 5. WEG cites Equus Computer Sys., Inc. v. N. Computer Sys., Inc., No. 01-CV-657, 2001 WL 1636487, at *3 (D. Minn. May 4, 2001), in support of its assertion that the information at issue had independent economic value. Although Equus involved customer lists, the court noted the "narrow" market for custom-built computer systems, a market distinct from WEG's.

Id. Based on that narrow market, the court found that "knowledge of the mere identity of customers is extremely valuable given their rarity and the uniqueness of their potential business." Id. WEG makes no such assertion here. Rather, Toshiba and WEG share a number of customers, including Weir Minerals, which is common in this particular industry. Pethers Opp'n Mem. at 12. As a result, mere knowledge of a customer does not present the same advantage as in Equus.

Further, "information that has or will quickly become obsolete does not have independent economic value to be considered a trade secret." Katch, LLC v. Sweetser, No. 15-CV-3760, 2015 WL 6942132, at *9 (D. Minn. Nov. 10, 2015) (citing Lexis-Nexis, 41 F. Supp. 2d at 958). Customer lists, pricing lists, and operation strategies may lose their economic value over the course of a few months. See Lexis-Nexis, 41 F. Supp. 2d at 959 (declaring four month old knowledge of corporate business policies and strategies to be of little value and thus not a trade secret); Katch, 2015 WL 6942132, at *9 (noting that the customer and pricing lists were "more than a month old" and "may already be stale, or soon become so"). WEG's allegedly misappropriated information is at least four to twenty-four months old, which minimizes its independent economic value.

Finally, information does not constitute a trade secret if it is "readily ascertainable by proper means." Minn. Stat. § 325C.01, subd. 5. The information in WEG's customer list is publically

available in state register listings. Pethers Decl. Ex. 3. Further, customers may identify competitors and their actual prices during negotiations. WEG makes much of its customer-specific multipliers, but its own website provides starting prices for its products. See, e.g., id. Exs. 1 and 2. A competitor can reverse-engineer a multiplier based on the starting price and the actual price. That information, which is publically available or readily ascertainable by proper means, does not constitute a trade secret.

## II. Threat of Irreparable Harm

The parties dispute whether Pethers' actions will damage WEG's customer relations and goodwill, and will cause it to lose revenue.

Damage to reputation and goodwill may qualify as irreparable harm. United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002). General allegations as to these harms, however, do not suffice. Watkins Inc. v. Lewis, 346 F.3d 841, 846 (8th Cir. 2003) (where plaintiffs alleged "generally that their customer relationships are being irreparably harmed and that their goodwill is being permanently diminished," "the district court was unable to assess whether [plaintiffs] were being irreparably harmed"). WEG points to only one customer contact by Pethers, and it does not even allege that it lost this customer. See id. (finding insufficient proof of harm where "only one customer was identified"). That, even combined with general allegations of damaged relations, does not rise to the level of irreparable harm.

Moreover, "economic loss does not, in and of itself, constitute irreparable harm," and "revenues and customers lost to competition which can be regained through competition are not irreparable." Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996).  In fact, MUTSA specifically provides a remedy for economic loss. Minn. Stat. § 325C.03(a).  Because WEG may be able to recover any lost revenue arising from MUTSA violations, it has not established that it will suffer irreparable harm.

## III. Balance of Harms

WEG asserts that the balance of harms weighs in its favor, and asks the court to prohibit Pethers from contacting any customers mentioned in the allegedly misappropriated information.

Non-compete orders are not the appropriate remedy in response to a claim of misappropriation. Int'l Bus. Mach. Corp. v. Seagate Tech., Inc., 941 F. Supp. 98, 101 (D. Minn. 1992) (citing E.W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969)). Such judicially imposed orders harm former employees by prohibiting their right to pursue their career.[1] See Int'l Bus. Mach. Corp., 941 F. Supp. at 101 ("[I]n the absence of a covenant not to compete or a finding of actual or an intent to disclose trade secrets, employees 'may pursue their chosen field of endeavor in direct competition' with their prior employer."); Katch, 2015 WL 6942132, at *10 ("[A] person's right to labor in any occupation in which he

---

[1] Pethers did not have a non-compete agreement with WEG.

9

is fit to engage is a valuable right, which should not be taken from him, or limited, by injunction, except in a clear case showing the justice and necessity therefor."). That would certainly be the case here.

WEG's requested non-compete order would prevent Pethers from contacting many of Toshiba's customers, which would effectively prevent him from performing his job. By contrast, WEG has failed to establish that it faces much, if any, harm, let alone irreparable harm. As a result, the balance of harms weighs against granting WEG's motion.

**IV.  Public Interest**

Public interests weigh in favor of both parties. "[P]ublic interest favors the protection of legitimate business interests and the discouragement of unfair competition," which weighs in WEG's favor. Equus, 2002 WL 1634334, at *4 (D. Minn. July 22, 2002). Similarly, "[e]nforcing valid contracts and preventing the unauthorized use and disclosure of trade secrets and confidential information always serve the public interest." Breton S.p.A. v. Cambria Co., No. 05-CV-2634, 2006 WL 314497, at *4 (D. Minn. Feb. 9, 2006). However, as noted, courts are also clear that judicial creation of a non-compete is against the public interest. Lexis-Nexis, 41 F. Supp. 2d at 959; Katch, 2015 WL 6942132, at *10. This factor is therefore neutral and does not affect the court's decision.

**CONCLUSION**

Accordingly, based on the above and as stated at the hearing, **IT IS HEREBY ORDERED** that plaintiff's motion for a temporary restraining order [ECF No. 5] is denied.

Dated: April 12, 2016

s/David S. Doty
David S. Doty, Judge
United States District Court
